MT. HOLLY NURSING CENTER; Beverly Health and Rehabilitation Services, Inc.; Golden Livingcenter–Mt. Holly; GGNSC Louisville Mt. Holly, LLC; Beverly Enterprises, Inc.; and Beverly California Corporation, aka Beverly Enterprises, Inc., d/b/a Health and Rehabilitation Services, Inc., Appellants,

v.

Karen CROWDUS, Power of Attorney and Next Friend of Mary A. McGaughey, Appellee.

No. 2007–CA–001708–MR.

Court of Appeals of Kentucky.

July 25, 2008.

Discretionary Review Denied by Supreme Court May 13, 2009.

A. Courtney Guild, Jr., Edward L. Schoenbaechler, Louisville, KY, for appellant.

Jacques G. Balette, Houston, TX, Charles Hessel, Waller, TX, for appellee.

Before COMBS, Chief Judge; KELLER, Judge; HENRY,[1] Senior Judge.

## OPINION

KELLER, Judge.

Mt. Holly Nursing Center; Beverly Health and Rehabilitation Services, Inc.; Golden Livingcenter–Mt. Holly; GGNSC Louisville Mt. Holly, LLC; Beverly Enterprises, Inc.; and Beverly California Corporation, AKA Beverly Enterprises, Inc., D/B/A Health and Rehabilitation Services, Inc. (hereinafter collectively referred to as Mt. Holly) appeal from the Jefferson Circuit Court's order denying their motion to enforce an arbitration agreement. Mt. Holly argues that Karen Crowdus (Crowdus) signed an arbitration agreement on behalf of and as an agent of Mary A. McGaughey (McGaughey) and that McGaughey is bound by that agreement. Crowdus argues that she was not McGaughey's agent when she signed the arbitration agreement and that, for a number of reasons, the arbitration agreement is not valid and therefore not enforceable. For the reasons set forth below, we affirm.

## FACTS

The parties do not dispute the underlying facts. Crowdus is a friend of McGaughey and, although not related to McGaughey, Crowdus referred to McGaughey as her aunt. McGaughey, who lived with her elderly mother, suffered from physical problems related to a cervical fusion, diabetes, arthritis, and hypertension. In 1999, Crowdus began helping McGaughey by running errands for her and driving her to her physician's appointments and to the store. At that time, Crowdus did not assist McGaughey with any of her business affairs, and she had no knowledge of McGaughey's finances.

In February of 2001, McGaughey designated Crowdus as her health care surrogate. McGaughey and Crowdus discussed whether McGaughey should provide Crowdus with a general power of attorney; however, they decided that was not necessary.

In October of 2005, McGaughey's mother telephoned Crowdus and said that McGaughey was "sick." Crowdus told McGaughey's mother to call an ambulance, which she did. Crowdus then went to McGaughey's house to get McGaughey's insurance cards and to Jewish Hospital to help McGaughey "sign in." During her deposition, Crowdus could not remember if she signed any documents related to McGaughey's admission to Jewish Hospital. However, Crowdus did remember that hospital personnel advised her that McGaughey would need care in a nursing home when she was discharged. To assist with that placement, hospital personnel provided Crowdus with the names of several nursing homes. Crowdus discussed the options with McGaughey, and they chose Mt. Holly because it was the one closest to Crowdus's home.

On October 31, 2005, McGaughey was discharged from Jewish Hospital and transported to Mt. Holly by ambulance. When Crowdus arrived at Mt. Holly, which was sometime after McGaughey, a Mt. Holly employee asked Crowdus if she could sign "admission papers" for McGaughey. According to Crowdus's testimony, no one from Mt. Holly explained to her the various documents she was signing. Crowdus did not read the documents, which she believed were "admission papers and . . . to bill [McGaughey's] insur-

---

1. Senior Judge Michael L. Henry sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

ance...." Crowdus simply flipped through the documents and signed where indicated.

Crowdus testified that no one from Mt. Holly asked her if she had a power of attorney, if she had been appointed McGaughey's guardian, or if she had the authority to sign documents on behalf of McGaughey. She was simply asked if she could sign the admission documents.

In January of 2006, McGaughey left Mt. Holly and returned home. However, in March of 2006, McGaughey was readmitted to Mt. Holly. Crowdus testified that she again signed the "admission papers." As with the initial admission, Crowdus testified that no one explained to her what the documents were, and she did not read them.

Maggie Stearman (Stearman), Director of Admissions at Mt. Holly, testified that, as part of her job duties, she assists patients and family members with the completion of documents necessary to effectuate admission to Mt. Holly. Stearman is also required to explain those documents.

Stearman did not remember going through the admission process with either Crowdus or McGaughey. However, she testified that she generally asks the patient to review and sign the admission documents. If the patient is unable or unwilling to do so, Stearman asks the patient to provide the name of someone who is authorized to sign the admission documents. Stearman then reviews the documents with that person, and obtains that person's signature. To determine if a person is authorized to sign on behalf of a patient, Stearman asks "if she is the person who signs for" the patient. Generally, Stearman asks to see a power of attorney and, if provided, keeps a copy for the patient's file.

As to the arbitration agreement, Stearman testified that she generally

put[s][it] in front of the family so that they can read it and understand it. [She] tell[s] them that it is an arbitration agreement, that if there's ever any problems or concerns, they can always come to the director of nursing or executive director. But if it cannot be resolved, they are agreeing to go to arbitration instead of filing a lawsuit.

Jennifer Willis Price (Price), Clinical Liaison for Mt. Holly, testified that she assumed the duties of director of admissions in the spring of 2006, when Stearman was on maternity leave. Price handled McGaughey's admission in March of 2006; however, like Stearman, Price could not remember it.

Price testified that, like Stearman, she generally attempts to get the patient to complete the admission documents. However, if the patient will not or cannot do so, Price will look to someone else. Price did not remember if McGaughey had authorized Crowdus to sign the admission documents; however, Price does not believe that Crowdus had a power of attorney when she signed the admission documents on behalf of McGaughey.

When reviewing the admission documents, Price usually "give[s] a general explanation of what the document is and then ask[s] them to read it and then to sign." Price explains the arbitration agreement as

an agreement between the facility and patient that if there is a problem or they feel like there is something that has been done wrong, that they have the right to try to solve the problem with the facility. And then if the problem cannot be solved, that they would go to an arbitration committee or person without having to obtain—either party obtain lawyers or go into any kind of court or trial.

Finally, Price reviewed the nursing notes dated near McGaughey's two admissions to Mt. Holly. Those notes indicate that McGaughey was alert and oriented, could understand others, and could make. herself understood.

As noted above, the circuit court denied Mt. Holly's motion to compel arbitration. Before us, as they did before the circuit court, Mt. Holly argues that Crowdus had the apparent authority to bind McGaughey to the arbitration agreements; that McGaughey was a third-party beneficiary of those agreements and is therefore estopped from challenging their enforceability; and that Crowdus, who currently has a power of attorney from McGaughey, should be estopped from denying the validity of the arbitration agreements. Crowdus argues that the arbitration agreements are not binding on McGaughey because McGaughey did not sign them; Crowdus was not authorized to sign the agreements on McGaughey's behalf; McGaughey was not a third-party beneficiary to the arbitration agreements; and the arbitration agreements are not enforceable because they are unconscionable and/or were obtained through fraud.

## STANDARD OF REVIEW

The issues raised by Mt. Holly on appeal are primarily issues of law; therefore, our review is *de novo*. *Carroll v. Meredith*, 59 S.W.3d 484, 489 (Ky.App.2001); *see also A & A Mechanical, Inc. v. Thermal Equipment Sales, Inc.*, 998 S.W.2d 505, 509 (Ky. App.1999); *Aubrey v. Office of Attorney General*, 994 S.W.2d 516, 518–19 (Ky.App. 1998); and *Cinelli v. Ward*, 997 S.W.2d 474, 476 (Ky.App.1998).

## ANALYSIS

■ At the outset, we note that Kentucky law generally favors the enforcement of arbitration agreements. *Kodak* *Mining Co. v. Carrs Fork Corp.*, 669 S.W.2d 917, 919 (Ky.1984). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. . . ." *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24–5, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). However, "the existence of a valid arbitration agreement as a threshold matter must first be resolved by the court." *General Steel Corp. v. Collins*, 196 S.W.3d 18, 20 (Ky.App.2006) (emphasis omitted). The court must determine whether an arbitration agreement is "valid, enforceable, and irrevocable, [based] upon such grounds as exist at law for the revocation of any contract." Kentucky Revised Statutes (KRS) 417.050. Guided by the preceding, we will address whether the arbitration agreements signed by Crowdus are valid and enforceable against McGaughey.

### A. Apparent Agency

■ Mt. Holly argues that Crowdus had the apparent authority to sign the arbitration agreements on behalf of McGaughey and that it was entitled to rely on Crowdus's signature as binding on McGaughey. Apparent authority "is not actual authority but is the authority the agent is held out by the principal as possessing. It is a matter of appearances on which third parties come to rely. *Estell v. Barrickman*, [571 S.W.2d 650 (Ky.App.1978) ]." *Mill Street Church of Christ v. Hogan*, 785 S.W.2d 263, 267 (Ky.App.1990). Mt. Holly argues that McGaughey cloaked Crowdus with apparent authority when McGaughey permitted Crowdus: (1) to sign admission documents at Jewish Hospital in October of 2005; (2) to sign admission documents at Mt. Holly in October of 2005; and (3) to sign admission documents at Mt. Holly in March of 2006. We will address the circumstances of each admission in chronological order.

Mt. Holly states that Crowdus testified that she signed documents on behalf of McGaughey when McGaughey was admitted to Jewish Hospital. Crowdus did testify that she went to Jewish Hospital to "sign [McGaughey] in." However, when asked if she recalled if she had signed any documents, Crowdus testified as follows: "I don't—I really don't remember. I could have signed her in. I—I know I just had to present her insurance cards. I don't remember if I signed anything." This is the only testimony regarding McGaughey's admission to Jewish Hospital, and Mt. Holly has not directed us to any documents from Jewish Hospital that contain Crowdus's signature. Furthermore, to the extent any such documents exist, there is nothing in the record indicating that anyone at Mt. Holly possessed or had access to those documents.

Mt. Holly also argues that Crowdus, after consulting with Jewish Hospital personnel, chose Mt. Holly for McGaughey. However, Crowdus testified that, while she did consult with Jewish Hospital personnel, both she and McGaughey chose Mt. Holly. Furthermore, there is nothing in the record showing that anyone at Mt. Holly knew these facts prior to this litigation.

Finally, as to the Jewish Hospital admission, Mt. Holly argues that Crowdus admitted that personnel from the hospital came to her regarding the nursing home placement because McGaughey "may have told them to ask me." However, that speculation by Crowdus came after she testified that she did not know why hospital personnel came to her. Furthermore, there is no evidence that anyone at Mt. Holly knew of or could have known of the alleged conversation between McGaughey and Jewish Hospital personnel.

■ In summary, even if the evidence supported Mt. Holly's contention that Crowdus signed documents to admit McGaughey to Jewish Hospital, there is no evidence that anyone at Mt. Holly knew anything regarding the circumstances of that admission. Therefore, Mt. Holly could not have determined that Crowdus had apparent authority to act on McGaughey's behalf from her admission to Jewish Hospital.

As to McGaughey's October 2005 admission to Mt. Holly, Stearman, the admissions director at the time, testified that she usually asks the patient to sign the admission documents. If the patient will not or cannot sign the documents, then Stearman asks who is authorized to sign on behalf of the patient and obtains the necessary signatures from that person. However, Stearman could not remember anything about McGaughey's admission and could not state that she spoke with McGaughey. The only testimony is from Crowdus, who testified that Stearman asked if she could sign the admission documents for McGaughey. According to Crowdus, Stearman did not ask for a power of attorney or otherwise attempt to determine what authority Crowdus had to sign documents on McGaughey's behalf. Therefore, as with McGaughey's admission to Jewish Hospital, there is no evidence that McGaughey did anything to hold Crowdus out as having any authority to act on her behalf.

As to McGaughey's March 2006 admission to Mt. Holly, Price, the acting director of admissions, testified that she usually asked patients to sign the admission documents. If a patient would not or could not sign the documents, then Price would ask who was authorized to sign on behalf of the patient and obtain the necessary signatures from that person. However, Price could not remember anything about McGaughey's admission and could not remember if she spoke with McGaughey.

Crowdus testified that she was presented with documents to sign, which she did. There is no evidence that Price obtained a power of attorney from Crowdus or any other documentation that would have authorized Crowdus to enter into the arbitration agreement on behalf of McGaughey. Furthermore, there is no evidence that Price actually spoke with McGaughey as part of the admission process. As with McGaughey's admission to Jewish Hospital and her October 2005 admission to Mt. Holly, there is no evidence that McGaughey did anything in March 2006 to hold Crowdus out as having any authority to act on her behalf.

Finally, Mt. Holly argues that McGaughey's acquiescence to Crowdus's signing of the arbitration agreement in October 2005, cloaked Crowdus with the apparent authority to sign the arbitration agreement in March 2006. However, there is no evidence that McGaughey ever saw any of the documents Crowdus signed in October 2005. Therefore, there is no evidence that McGaughey acquiesced to the waiver of her right to a jury trial by Crowdus.

For the foregoing reasons, we hold that Crowdus did not have apparent authority to sign the arbitration agreements on behalf of McGaughey.

### B.  Third–Party Beneficiary

Mt. Holly argues that McGaughey was a third-party beneficiary to the admission and arbitration agreements and is therefore estopped from denying the validity of the arbitration agreements. Crowdus argues that the arbitration agreements are not valid third-party beneficiary contracts and that the case law cited by Mt. Holly does not apply. For the reasons set forth below, we agree with Crowdus.

■ As noted by Crowdus, before we can determine whether McGaughey was a third-party beneficiary to the arbitration

agreements, we must determine if the arbitration agreements were valid and enforceable. "A written agreement to submit any existing controversy to arbitration or a provision in written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law for the revocation of any contract." KRS 417.050. To determine if an arbitration agreement is enforceable, we rely on "rudimentary principles governing contract law." *General Steel Corp. v. Collins,* 196 S.W.3d 18, 20 (Ky.App.2006). Where there is no ambiguity, a contract is to be strictly enforced according to its terms, which are to be interpreted by assigning language its ordinary meaning and without resort to extrinsic evidence. *Island Creek Coal Co. v. Wells,* 113 S.W.3d 100, 104 (Ky.2003).

■ Looking to the present case, we recognize that each arbitration agreement states that it is to be signed by the patient unless the patient "is unable to consent or sign … because of physical disability or mental incompetence or [if she] is a minor." If the patient falls within one of the preceding categories "an authorized representative" may sign the agreement. Therefore, the proper parties to the agreements are: (1) the nursing home and (2) the patient, if competent, or the patient's authorized representative.

There is no dispute that McGaughey was both physically and mentally competent to sign the agreements. Therefore, by the express terms of the agreements, McGaughey's signature was necessary. If McGaughey had been incompetent, her signature would not have been necessary; however, that is not the case. Because McGaughey was competent, Crowdus should not have been asked to sign the agreements and her

signature could not bind McGaughey to the agreements.

Furthermore, even if McGaughey had not been competent to sign the arbitration agreements, there is no evidence that Crowdus was authorized to sign the agreements in McGaughey's stead. Therefore, we hold that the arbitration agreements were not valid or enforceable and we need not reach the question of whether McGaughey was a third-party beneficiary.

We note that the cases cited by Mt. Holly indicating that a third person can bind a nursing home patient to an arbitration agreement are distinguishable.

In *JP Morgan Chase & Co. v. Conegie,* 492 F.3d 596 (5th Cir.2007), Conegie was not competent to sign any documents upon her admission to a Mississippi nursing home. Therefore, Conegie's mother signed the admission agreement on her behalf. The admission agreement contained an arbitration provision, which Conegie sought to invalidate because the admission agreement lacked her signature. The Fifth Circuit Court of Appeals held that the arbitration provision in the admission agreement was binding on Conegie. In doing so, the Court noted that Conegie was incompetent, that Mississippi law provided that Conegie's mother was an appropriate person to make health care decisions for Conegie, and that Conegie's mother signed the admission agreement on Conegie's behalf.

*Conegie* is distinguishable on three fronts. First, unlike Conegie, McGaughey was competent upon admission to Mt. Holly. Second, unlike Conegie's mother, who signed the admission agreement for Conegie, Crowdus was not related to McGaughey. Third, Mississippi law states that a heath care surrogate may make decisions regarding the selection and discharge of health care providers, approval or disapproval of diagnostic tests, and directions as to providing or withdrawing nutrition and hydration. Mississippi Code Annotated 41–41–203(h) However, Kentucky's statute only provides that a health care surrogate may decide whether to consent to or withdraw consent for treatment and/or intervention. KRS 311.621(8).

In *Alterra Healthcare Corp. v. Estate of Linton,* 953 So.2d 574 (Fla.App.2007), Linton was suffering from Alzheimer's disease when admitted to the nursing home. Her son signed an arbitration agreement on her behalf. When Linton died, the estate sought to avoid the arbitration agreement. The Florida Court of Appeals held that the arbitration agreement was enforceable because Linton was a third-party beneficiary to the agreement.

*Linton* is distinguishable on two fronts. First, unlike McGaughey, Linton was not competent to sign the admission documents. Second, unlike herein, there was a valid agreement from which Linton could benefit.

As to *Trinity Mission of Clinton, LLC v. Barber,* 2007 WL 2421720 (Miss.App. 2007), the Supreme Court of Mississippi granted Barber's motion for discretionary review on March 13, 2008. Therefore, that decision is not final.

In *Mariner Healthcare, Inc. v. Hunt,* 2005 WL 1711614 (N.D.Miss.2005), Viola Crigler signed an arbitration agreement on behalf of Hunt. The court held that the agreement, absent some unconscionable provisions, was valid and enforceable. However, the court did not set forth whether Hunt was competent or in what capacity Crigler was acting when she signed the agreement for Hunt. As in *Hunt,* the court in *Mariner Health Care, Inc. v. Weeks,* 2006 WL 2056588 (N.D.Miss.2006), did not set forth any of the underlying facts concerning Weeks's

competency or the authority in place for someone to sign on behalf of Weeks.

In *Carraway v. Beverly Enterprises Alabama, Inc.,* 978 So.2d 27 (Ala.2007), the patient's brother signed a number of documents prior to her admission to a nursing home. After her admission, the patient signed a durable power of attorney naming her brother as her attorney in fact. After the patient's death, her brother attempted to abrogate an arbitration agreement. The court determined that the agreement was enforceable, noting that the evidence indicated that Carraway approved of her brother's acting on her behalf. Unlike *Carraway,* there is no evidence herein that McGaughey knew that Crowder was acting on her behalf or that she approved.

Finally, in *Ruesga v. Kindred Nursing Centers, L.L.C.,* 215 Ariz. 589, 161 P.3d 1253 (2007), the patient had suffered a massive stroke and was unresponsive when admitted to the nursing home. His wife signed the admission documents, including an arbitration agreement. When the wife later attempted to invalidate the arbitration agreement, the nursing home argued that she had the authority to waive her husband's right to a jury trial. In doing so, the court noted a history of Ruesga's wife's signing documents on his behalf. Furthermore, the court noted that, because of the marital relationship, the proof required to establish an agency relationship was not as significant as that required between non-spouses. Clearly, this differs from the case herein since Crowdus was not married to McGaughey, there was not a long history of Crowdus signing documents on behalf of McGaughey, and McGaughey was competent when Crowdus signed the arbitration agreements.

### C. Estoppel

Because we have determined that the arbitration agreements were not valid con-tracts, we do not need to reach the estoppel arguments raised by Mt. Holly.

### CONCLUSION

For the reasons set forth above, we hold that Crowdus did not have the authority to sign the arbitration agreements on behalf of McGaughey. Furthermore, because the agreements were not properly executed, they were not enforceable, and McGaughey could not have been a third-party beneficiary. Therefore, we affirm.

ALL CONCUR.