# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

No. 12-0717

**FILED**

**January 24, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA EX REL. AMFM, LLC;
COMMERCIAL HOLDINGS, INC.,
now known as COMMERCIAL HOLDINGS, LLC;
INTEGRATED COMMERCIAL ENTERPRISES, INC.;
MANZANITA HOLDINGS, LLC;
MANZANITA MANAGEMENT, INC.;
LIFETREE, LLC; WISTERIA, LLC;
MCDOWELL NURSING & REHABILITATION CENTER, INC.,
doing business as MCDOWELL NURSING & REHABILITATION CENTER;
and PATTY LUCAS,
Petitioners**

**V.**

**HONORABLE CHARLES E. KING,
JUDGE OF THE CIRCUIT COURT OF KANAWHA COUNTY; and
LELIA GRESHAM BAKER, INDIVIDUALLY
AND ON BEHALF OF THE ESTATE OF BEULAH WYATT,
Respondents**

---

**Petition for a Writ of Prohibition
Kanawha County Civil Action No. 11-C-2144
WRIT DENIED**

---

Submitted: January 8, 2013
Filed: January 24, 2013

Mark A. Robinson                           James B. McHugh
Ryan A. Brown                              Michael J. Fuller, Jr.
Kace M. Legg                               D. Bryant Chaffin
Flaherty Sensabaugh Bonasso PLLC           McHugh Fuller Law Group, PLLC

**Charleston, West Virginia**
**Attorneys for the Petitioners**

**Hattiesburg, Mississippi**
**Attorneys for the Respondent,**
**Lelia Gresham Baker**

**JUSTICE DAVIS delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.      "In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression.  These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue.  Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight."  Syllabus point 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).

2.      "'When a trial court is required to rule upon a motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-307 (2006), the authority of the trial court is limited to determining the threshold issues of (1) whether a valid

arbitration agreement exists between the parties; and (2) whether the claims averred by the plaintiff fall within the substantive scope of that arbitration agreement.' Syl. Pt. 2, *State ex rel. TD Ameritrade, Inc. v. Kaufman*, 225 W. Va. 250, 692 S.E.2d 293 (2010)." Syllabus point 4, *Ruckdeschel v. Falcon Drilling Co., L.L.C.*, 225 W. Va. 450, 693 S.E.2d 815 (2010).

3.　"The purpose of the Federal Arbitration Act, 9 U.S.C. § 2, is for courts to treat arbitration agreements like any other contract. The Act does not favor or elevate arbitration agreements to a level of importance above all other contracts; it simply ensures that private agreements to arbitrate are enforced according to their terms." Syllabus point 7, *Brown v. Genesis Healthcare Corp.*, 228 W. Va. 646, 724 S.E.2d 250 (2011), *overruled on other grounds by Marmet Health Care Center, Inc. v. Brown*, ___ U.S. ___, 132 S. Ct. 1201, 182 L. Ed. 2d 42 (2012) (per curiam).

4.　"'The fundamentals of a legal contract are competent parties, legal subject matter, valuable consideration and mutual assent. There can be no contract if there is one of these essential elements upon which the minds of the parties are not in agreement.' Syllabus Point 5, *Virginian Export Coal Co. v. Rowland Land Co.*, 100 W. Va. 559, 131 S.E. 253 (1926)." Syllabus point 3, *Dan Ryan Builders, Inc. v. Nelson*, ___ W. Va. ___, ___ S.E.2d ___ (No. 12-0592 Nov. 15, 2012).

5. "Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syllabus point 2, *State v. Elder*, 152 W. Va. 571, 165 S.E.2d 108 (1968).

6. The West Virginia Health Care Decisions Act, W. Va. Code § 16-30-1 *et seq.*, authorizes a health care surrogate to make health care decisions on behalf of the incapacitated person for whom the surrogate has been appointed.

7. The health care decisions that a health care surrogate is authorized to make on behalf of the incapacitated person for whom the surrogate has been appointed are "decision[s] to give, withhold or withdraw informed consent to any type of health care, including, but not limited to, medical and surgical treatments, including life-prolonging interventions, psychiatric treatment, nursing care, hospitalization, treatment in a nursing home or other facility, home health care and organ or tissue donation." W. Va. Code § 16-30-3(i) (2002) (Repl. Vol. 2011).

8. An agreement to submit future disputes to arbitration, which is optional and not required for the receipt of nursing home services, is not a health care decision under the West Virginia Health Care Decisions Act, W. Va. Code § 16-30-1 *et seq.*

**Davis, Justice:**

The petitioners herein, McDowell Nursing and Rehabilitation Center, et al. (hereinafter "McDowell Nursing"),[1] request this Court to issue a writ of prohibition to prevent the Circuit Court of Kanawha County from enforcing its March 28, 2012, order. By that order, the circuit court denied McDowell Nursing's motion to dismiss and refused to enforce the Arbitration Agreement signed by Nancy Belcher (hereinafter "Ms. Belcher"), who was the designated health care surrogate of the respondents' decedent, Beulah Wyatt (hereinafter "Ms. Wyatt"); the Arbitration Agreement had been presented to Ms. Belcher in conjunction with Ms. Wyatt's admission to McDowell Nursing's facility. In short, the circuit court concluded that because Ms. Belcher was Ms. Wyatt's health care surrogate, her authority was limited to making health care decisions on behalf of Ms. Wyatt and did not extend to the subject Arbitration Agreement. Before this Court, McDowell Nursing requests a writ of prohibition to prevent the circuit court from enforcing its order and further requests this Court to uphold said Arbitration Agreement. Upon a review of the parties' arguments, the appendix record, and the pertinent authorities, we deny the requested writ of prohibition. In summary, Ms. Belcher's authority as Ms. Wyatt's health care surrogate permitted her to make only health care decisions for Ms. Wyatt; Ms. Belcher, as a health care surrogate, did

---

[1]For ease of reference, the multiple petitioners herein will be referred to collectively as "McDowell Nursing," unless the context dictates otherwise. The other named petitioners are affiliates of McDowell Nursing through their operation, management, ownership, monitoring, administration, control, and/or custodial care of patients of such facility.

1

not have the authority to enter the subject Arbitration Agreement because it was not a health care decision and was not required for Ms. Wyatt's receipt of nursing home services from McDowell Nursing.

# I.

## FACTUAL AND PROCEDURAL HISTORY

The facts of the instant proceeding are straightforward and not disputed by the parties. On September 7, 2009, Ms. Wyatt's physician determined her to be indefinitely incapacitated and incapable of making her own medical decisions;[2] therefore, Ms. Wyatt's physician selected Ms. Wyatt's daughter, Ms. Belcher, to serve as her health care surrogate.[3] At the end of the "Checklist for Surrogate Selection" completed by Ms. Wyatt's physician, Ms. Belcher consented to the "Acceptance of Surrogate Selection" portion of the document, which stated "I accept the appointment as surrogate for Beulah Wyatt and understand I have the authority to make all medical decisions for Beulah Wyatt."[4]

Thereafter, on September 10, 2009, Ms. Wyatt was admitted to McDowell

---

[2]Ms. Wyatt had Alzheimer's disease and dementia.

[3]W. Va. Code § 16-30-8 (2002) (Repl. Vol. 2011) authorizes a physician to select a health care surrogate for an incapacitated patient.

[4]Subsequently, on December 8, 2009, Ms. Wyatt appointed Ms. Belcher to serve as her power of attorney.

2

Nursing to receive nursing home care. During the course of the admissions process, Ms. Belcher completed and signed numerous documents, including a "Resident and Facility Arbitration Agreement" (hereinafter "Arbitration Agreement"), which required that "any legal dispute, controversy, demand or claim . . . that arises out of or relates to the Resident Admission Agreement or any service or health care provided by the Facility [McDowell Nursing] to the Resident [Ms. Wyatt] shall be resolved exclusively by binding arbitration." The Arbitration Agreement further provided that "THE PARTIES UNDERSTAND AND AGREE THAT BY ENTERING THIS ARBITRATION AGREEMENT THEY ARE GIVING UP AND WAIVING THEIR CONSTITUTIONAL RIGHT TO HAVE ANY CLAIM DECIDED IN A COURT OF LAW BEFORE A JUDGE AND A JURY." (Emphasis in original). Finally, the Arbitration Agreement indicated that acquiescence thereto was not a precondition of Ms. Wyatt's admission to McDowell Nursing or her receipt of services therefrom and that she could rescind the Arbitration Agreement within thirty days of its signing.[5]

For the next ten months, Ms. Wyatt resided at McDowell Nursing. During the course of her residency there, she allegedly sustained pressure sores, infections, dehydration, malnutrition, and other injuries which the respondent herein, Lelia Gresham Baker

---

[5]For additional provisions of the Arbitration Agreement, see notes 7 and 8, *infra*.

(hereinafter "Ms. Baker"), another of Ms. Wyatt's daughters and the personal representative of her estate, claims contributed to Ms. Wyatt's death on July 31, 2010.

On December 1, 2011, Ms. Baker filed a wrongful death suit against McDowell Nursing alleging, among other things, that its negligent care of Ms. Wyatt caused and/or contributed to her death. McDowell Nursing then filed a motion to dismiss the suit and to enforce the Arbitration Agreement that was signed by Ms. Belcher upon Ms. Wyatt's admission to its facility. By order entered March 28, 2012, the circuit court denied McDowell Nursing's motion and concluded that the subject Arbitration Agreement was unenforceable. In rendering its ruling, the circuit court concluded that

> Nancy Belcher had the authority to act on the behalf of Beulah Wyatt pursuant to the Health Care Decisions Act, codified at W. Va. Code § 16-30-1, et seq. Pursuant to § 16-30-8, a "surrogate is authorized to make health care decisions on behalf of the incapacitated person. . . ."
>
> The Health Care Decision[s] Act specifically defines what a "health care decision" includes and provides:
>
> "Health care decision" means a decision to give, withhold or withdraw informed consent to any type of health care, including, but not limited to, medical and surgical treatments, including life-prolonging interventions, psychiatric treatment, nursing care, hospitalization, treatment in a nursing home or other facility, home health care and organ or tissue donation. [W. Va. Code § 16-30-3(i) (2002) (Repl. Vol. 2011).]
>
> Upon reviewing the [A]rbitration [A]greement at issue in this matter, it does not address any type of medical or surgical treatments, life-prolonging interventions, psychiatric treatment,

4

nursing care, hospitalization, treatment in the nursing home, or organ or tissue donation. . . .

The [A]rbitration [A]greement itself indicates exactly what it does:

THE PARTIES UNDERSTAND AND AGREE THAT BY ENTERING THIS ARBITRATION AGREEMENT THEY ARE GIVING UP AND WAIVING THEIR CONSTITUTIONAL RIGHT TO HAVE ANY CLAIM DECIDED IN A COURT OF LAW BEFORE A JUDGE AND A JURY.

. . . .

The Court does not believe that the Health Care Decisions Act, codified at W. Va. Code § 16-30-1, et seq., was intended to allow a surrogate to waive one's constitutional right to trial by jury or access to the Courts of this State. Therefore the Court finds that Nancy Belcher, as surrogate of Beulah Wyatt, did not have authority to waive her constitutional right to a jury trial.

(Footnote and citations omitted). The circuit court also questioned the validity of Ms. Wyatt's later appointment of Ms. Belcher as her power of attorney, insofar as Ms. Wyatt previously had been determined to lack capacity, and rejected McDowell Nursing's apparent authority argument. From this adverse ruling, McDowell Nursing seeks prohibitory relief from this Court.

## II.

## STANDARD FOR ISSUANCE OF WRIT

McDowell Nursing requests this Court to issue a writ of prohibition to prevent the circuit court from enforcing its March 28, 2012, order invalidating the Arbitration Agreement. This Court does not grant extraordinary relief lightly. Rather, "[a] writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. *W. Va. Code*, 53-1-1." Syl. pt. 2, *State ex rel. Peacher v. Sencindiver*, 160 W. Va. 314, 233 S.E.2d 425 (1977). Thus, a party seeking relief through this channel must navigate a precipitous course and demonstrate his/her entitlement to such an extraordinary remedy. The Court's consideration of a request for prohibitory relief entails an examination of the following criteria:

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear

that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996). In keeping with this standard, we proceed to consider the merits of McDowell Nursing's request for a writ of prohibition.

# III.

# DISCUSSION

Although this Court recently has considered the validity of arbitration provisions in nursing home admission contracts, *see, e.g., Brown v. Genesis Healthcare Corp.*, 229 W. Va. 382, 729 S.E.2d 217 (2012) (hereinafter "*Brown II*"), the instant query appears to present an issue of first impression for this Court: is an agreement to arbitrate disputes related to nursing home care a health care decision within the authority granted to a health care surrogate by the West Virginia Health Care Decisions Act, W. Va. Code § 16-30-1 *et seq.* Petitioner McDowell Nursing contends that Ms. Belcher had the authority to sign the subject Arbitration Agreement on behalf of her mother, Ms. Wyatt, and, thus, the circuit court erred by refusing to enforce the Arbitration Agreement. Ms. Baker disagrees and contends that the Arbitration Agreement was not a health care decision within the ambit of Ms. Belcher's authority as Ms. Wyatt's health care surrogate. We agree with the respondents that the Arbitration Agreement was not a health care decision, and, thus, Ms. Belcher did not have the authority as a health care surrogate to sign such agreement.

7

Accordingly, we deny the requested writ of prohibition.

At the heart of this inquiry is whether the Arbitration Agreement signed by Ms. Belcher at the time of Ms. Wyatt's admission to McDowell Nursing is enforceable. We previously have held that,

> "[w]hen a trial court is required to rule upon a motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-307 (2006), the authority of the trial court is limited to determining the threshold issues of (1) whether a valid arbitration agreement exists between the parties; and (2) whether the claims averred by the plaintiff fall within the substantive scope of that arbitration agreement." Syl. Pt. 2, *State ex rel. TD Ameritrade, Inc. v. Kaufman*, 225 W. Va. 250, 692 S.E.2d 293 (2010).

Syl. pt. 4, *Ruckdeschel v. Falcon Drilling Co., L.L.C.*, 225 W. Va. 450, 693 S.E.2d 815 (2010). Thus, we first must consider whether a valid arbitration agreement exists.

As a written understanding between parties to resolve future disputes through arbitration, the validity of an arbitration agreement is determined in the same manner that the validity of other written agreements is determined–through the application of well-established contract principles. "Nothing in the Federal Arbitration Act, 9 U.S.C. § 2, overrides normal rules of contract interpretation." Syl. pt. 9, in part, *Brown v. Genesis Healthcare Corp.*, 228 W. Va. 646, 724 S.E.2d 250 (2011) (hereinafter "*Brown I*"), *overruled on other grounds by Marmet Health Care Ctr., Inc. v. Brown*, ___ U.S. ___, 132

S. Ct. 1201, 182 L. Ed. 2d 42 (2012) (per curiam).  Rather,

> [t]he purpose of the Federal Arbitration Act, 9 U.S.C. § 2, is for courts to treat arbitration agreements like any other contract.  The Act does not favor or elevate arbitration agreements to a level of importance above all other contracts; it simply ensures that private agreements to arbitrate are enforced according to their terms.

Syl. pt. 7, *Brown I*, 228 W. Va. 646, 724 S.E.2d 250, *overruled on other grounds by Marmet Health Care Ctr., Inc. v. Brown*, ___ U.S. ___, 132 S. Ct. 1201, 182 L. Ed. 2d 42.  Thus, to be valid, an arbitration agreement must conform to the rules governing contracts, generally.  We long have held that "'[t]he fundamentals of a legal contract are competent parties, legal subject matter, valuable consideration and mutual assent.  There can be no contract if there is one of these essential elements upon which the minds of the parties are not in agreement.' Syllabus Point 5, *Virginian Export Coal Co. v. Rowland Land Co.*, 100 W. Va. 559, 131 S.E. 253 (1926)."  Syl. pt. 3, *Dan Ryan Builders, Inc. v. Nelson*, ___ W. Va. ___, ___ S.E.2d ___ (No. 12-0592 Nov. 15, 2012).  Accordingly, to be valid, the subject Arbitration Agreement must have (1) competent parties; (2) legal subject matter; (3) valuable consideration; *and* (4) mutual assent.  *Id.*  Absent any one of these elements, the Arbitration Agreement is invalid.

The first contractual criterion that must be satisfied to hold valid the subject Arbitration Agreement is "competent parties."  Syl. pt. 3, in part, *Dan Ryan Builders*, ___ W. Va. ___, ___ S.E.2d ___.  To be a competent party, the persons or entities signing the Arbitration Agreement must have had the authority to do so.  Ms. Belcher, who had been

9

appointed her mother's health care surrogate prior to Ms. Wyatt's admission to McDowell Nursing, signed the Arbitration Agreement on her mother's behalf as part of the admission paperwork. The pivotal inquiry, then, is the nature and scope of a health care surrogate's authority.

A "health care surrogate" is a role created by legislation within the West Virginia Health Care Decisions Act, W. Va. Code § 16-30-1 *et seq.* (hereinafter "the Act"). As such, our consideration of the governing statutes will be guided by our well-established rules of statutory construction whereby we defer to the intent of the Legislature in enacting its laws and give effect to every word and phrase thereof to ensure their true meaning is accomplished. *See* Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975) ("The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature."). *See also* Syl. pt. 3, *Meadows v. Wal-Mart Stores, Inc.*, 207 W. Va. 203, 530 S.E.2d 676 (1999) ("A cardinal rule of statutory construction is that significance and effect must, if possible, be given to every section, clause, word or part of the statute."); *State ex rel. Johnson v. Robinson*, 162 W. Va. 579, 582, 251 S.E.2d 505, 508 (1979) ("It is a well known rule of statutory construction that the Legislature is presumed to intend that every word used in a statute has a specific purpose and meaning."). Nevertheless, our interpretation of the applicable statutes is foreclosed where their meaning is plain; at that juncture, this Court is obliged to construe, rather than interpret, the relevant

10

legislative language. "Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syl. pt. 2, *State v. Elder*, 152 W. Va. 571, 165 S.E.2d 108 (1968). *See also Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195 W. Va. 573, 587, 466 S.E.2d 424, 438 (1995) ("We look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed.").

The Legislature promulgated the West Virginia Health Care Decisions Act to achieve the following limited purpose and intent of facilitating health care decision-making:

> The purpose of this article is to ensure that a patient's right to self-determination in health care decisions be communicated and protected; and to set forth a process for private health care decision making for incapacitated adults, including the use of advance directives, which reduces the need for judicial involvement and defines the circumstances under which immunity shall be available for health care providers and surrogate decision makers who make health care decisions.

> The intent of the Legislature is to establish an effective method for private health care decision making for incapacitated adults, and to provide that the courts should not be the usual venue for making decisions. It is not the intent of the Legislature to legalize, condone, authorize or approve mercy killing or assisted suicide.

W. Va. Code § 16-30-2(a) (2000) (Repl. Vol. 2011). Consistent with this limited purpose, the Act provides for health care decisions to be made by a health care surrogate, which is defined as follows:

> "Surrogate decisionmaker" or "surrogate" means an individual eighteen years of age or older who is reasonably available, is willing to make *health care decisions* on behalf of an incapacitated person, possesses the capacity to make *health care decisions* and is identified or selected by the attending physician or advanced nurse practitioner in accordance with the provisions of this article as the person who is to make *those decisions* in accordance with the provisions of this article.

W. Va. Code § 16-30-3(z) (2002) (Repl. Vol. 2011) (emphasis added). Given the plain language of this provision, we hold that the West Virginia Health Care Decisions Act, W. Va. Code § 16-30-1 *et seq.*, authorizes a health care surrogate to make health care decisions on behalf of the incapacitated person for whom the surrogate has been appointed. As noted in the preceding definition, upon the determination that a patient is incapacitated,[6] the patient's physician may select a health care surrogate to make medical decisions for the incapacitated patient. *See generally* W. Va. Code § 16-30-8 (2002) (Repl. Vol. 2011) (describing process for selection of surrogate). This process is the manner by which Ms. Belcher was selected, and came to be designated, as Ms. Wyatt's health care surrogate.

The governing statutes also define what the Legislature contemplates when it refers to a "health care decision" that a health care surrogate is authorized to make on behalf of an incapacitated person:

---

[6]*See* W. Va. Code § 16-30-3(*l*) (2002) (Repl. Vol. 2011) (defining "incapacity") and W. Va. Code § 16-30-7 (2010) (Supp. 2012) (providing instructions for medical determination of incapacity).

12

> "Health care decision" means a decision to give, withhold or withdraw informed consent to any type of health care, including, but not limited to, medical and surgical treatments, including life-prolonging interventions, psychiatric treatment, nursing care, hospitalization, treatment in a nursing home or other facility, home health care and organ or tissue donation.

W. Va. Code § 16-30-3(i). This language also is plain. Accordingly, we hold that the health care decisions that a health care surrogate is authorized to make on behalf of the incapacitated person for whom the surrogate has been appointed are "decision[s] to give, withhold or withdraw informed consent to any type of health care, including, but not limited to, medical and surgical treatments, including life-prolonging interventions, psychiatric treatment, nursing care, hospitalization, treatment in a nursing home or other facility, home health care and organ or tissue donation." W. Va. Code § 16-30-3(i) (2002) (Repl. Vol. 2011).

A health care surrogate's authority to make health care decisions on behalf of an incapacitated person is further circumscribed by the Legislature as follows:

> (a) General Standards.

> [T]he health care surrogate shall make *health care decisions*:

> (1) In accordance with the person's wishes, including religious and moral beliefs; or

> (2) In accordance with the person's best interests if these wishes are not reasonably known and cannot with reasonable diligence be ascertained; and

13

(3) Which reflect the values of the person, including the person's religious and moral beliefs, to the extent they are reasonably known or can with reasonable diligence be ascertained.

(b) Assessment of best interests.

An assessment of the person's best interests shall include consideration of the person's medical condition, prognosis, the dignity and uniqueness of every person, the possibility and extent of preserving the person's life, the possibility of preserving, improving or restoring the person's functioning, the possibility of relieving the person's suffering, the balance of the burdens to the benefits of the proposed treatment or intervention and such other concerns and values as a reasonable individual in the person's circumstances would wish to consider.

W. Va. Code §§ 16-30-9(a-b) (2000) (Repl. Vol. 2011) (emphasis added).

Moreover, the "Acceptance of Surrogate Selection" portion of the standard "Checklist for Surrogate Selection" form also recognizes the health care surrogate's limited decisional authority by specifying the nature of the decisions that the health care surrogate may make. In the case *sub judice*, the "Acceptance of Surrogate Selection" by which Ms. Belcher consented to serve as Ms. Wyatt's surrogate, stated, "I accept the appointment as surrogate for Beulah Wyatt and understand I have the authority to make all *medical decisions* for Beulah Wyatt." (Emphasis added). This acknowledgment did not address Ms. Wyatt's constitutional rights or mention any other type of decision as being within the scope of Ms. Belcher's health care surrogate authority. Rather, the surrogate selection form very succinctly and specifically limited Ms. Belcher's authority to the making of "medical

14

decisions" on behalf of Ms. Wyatt, which restriction is consistent with the legislative explanation of a health care surrogate's authority.

From both the statutory pronouncements defining and clarifying the scope of a health care surrogate's authority and the actual form used by physicians to select a health care surrogate, it is clear that a decision to arbitrate disputes regarding care provided by a nursing home to an incapacitated person is not within the ambit of a health care surrogate's authority. This is particularly true in the case *sub judice* where both McDowell Nursing and Ms. Baker concede that acquiescence to the Arbitration Agreement was optional and not required for Ms. Wyatt's receipt of services from McDowell Nursing.[7] Further evidence of the understanding that the Arbitration Agreement was not a precondition to admission into McDowell Nursing's facility is the fact that, once signed, the signatory had thirty days within which to rescind his/her decision to be bound by the Agreement.[8] In light of the foregoing

_____

[7]The penultimate paragraph of the Arbitration Agreement provided that "the execution of this Arbitration Agreement is not a precondition to the furnishing of services to the Resident [Ms. Wyatt] by the Facility [McDowell Nursing]."

[8]In this regard, the Arbitration Agreement stated that

this Arbitration Agreement may be rescinded by written notice to the Facility [McDowell Nursing] from the Resident [Ms. Wyatt] within 30 days of signature. If not rescinded within 30 days, this Arbitration Agreement shall remain in effect for all care and services subsequently rendered at the Facility, even if such care and services are rendered following the Resident's discharge and readmission to the Facility.

15

authorities and consistent with the facts of the case *sub judice*, we therefore hold that an

agreement to submit future disputes to arbitration, which is optional and not required for the

receipt of nursing home services, is not a health care decision under the West Virginia Health

Care Decisions Act, W. Va. Code § 16-30-1 *et seq.*[9] Because the subject Arbitration

[9]Our holding also is in line with the decisions of other jurisdictions that have considered whether a health care surrogate has the authority to bind an incapacitated person, on whose behalf the surrogate has been appointed, to an arbitration provision. Although few courts have considered this issue, the prevailing view is that a decision to arbitrate future disputes is not a health care decision within the ambit of a health care surrogate's authority. *See, e.g., Estate of Irons ex rel. Springer v. Arcadia Healthcare, L.C.*, 66 So. 3d 396 (Fla. Dist. Ct. App. 2011); *Mt. Holly Nursing Ctr. v. Crowdus*, 281 S.W.3d 809 (Ky. Ct. App. 2008); *Mississippi Care Ctr. of Greenville, LLC v. Hinyub*, 975 So. 2d 211 (Miss. 2008); *Covenant Health & Rehab. of Picayune, LP v. Estate of Lambert ex rel. Lambert*, 984 So. 2d 283 (Miss. Ct. App. 2006). *Cf. Cook v. GGNSC Ripley, LLC*, 786 F. Supp. 2d 1166 (N.D. Miss. 2011) (finding that health care surrogate did not have authority to bind resident to arbitration agreement but arbitration provision nevertheless was enforceable because incapacitated person was intended third-party beneficiary thereof). *But see JP Morgan Chase & Co. v. Conegie ex rel. Lee*, 492 F.3d 596 (5th Cir. 2007) (concluding that health care surrogate can bind incapacitated person to arbitration provision and relying upon *Covenant Health Rehab of Picayune, L.P. v. Brown*, 949 So. 2d 732 (Miss. 2007), which subsequently was overruled by *Covenant Health & Rehabilitation of Picayune, LP v. Estate of Moulds ex rel. Braddock*, 14 So. 3d 695 (Miss. 2009)); *Covenant Health & Rehab. of Picayune, LP v. Lumpkin ex rel. Lumpkin*, 23 So. 3d 1092 (Miss. Ct. App. 2009) (same); *Covenant Health & Rehab. of Picayune, LP v. Estate of Moulds ex rel. Braddock*, 14 So. 3d 736 (Miss. Ct. App. 2008) (same), *cert. granted*, *Covenant Health & Rehab. of Picayune, LP v. Braddock*, 999 So. 2d 1280 (Miss. 2009), *rev'd*, *Covenant Health & Rehab. of Picayune, LP v. Estate of Moulds ex rel. Braddock*, 14 So. 3d 695 (Miss. 2009).

Furthermore, the foregoing analysis applies with equal force to a person who has been appointed as a medical power of attorney for an incapacitated person because a medical power of attorney is the functional equivalent of a health care surrogate. In other words, both a medical power of attorney and a health care surrogate have, as their sole function, the authority to make health care decisions on behalf of an incapacitated person. *Compare* W. Va. Code § 16-30-3(q) (2002) (Repl. Vol. 2011) (defining "medical power of

(continued...)

Agreement was *not* a health care decision, Ms. Belcher, whose role as Ms. Wyatt's health

[9](...continued)
attorney representative") *with* W. Va. Code § 16-30-3(z) (2002) (Repl. Vol. 2011) (defining "surrogate decisionmaker"). The difference between these two types of personal representatives is this: a medical power of attorney is chosen by an incapacitated person him/herself *before* he/she is rendered incapacitated whereas a health care surrogate is appointed on behalf of an incapacitated person *after* he/she has become incapacitated. *Compare* W. Va. Code § 16-30-4 (2007) (Supp. 2012) *and* W. Va. Code § 16-30-6 (2002) (Repl. Vol. 2011) (describing process for designation of medical power of attorney) *with* W. Va. Code § 16-30-8 (2002) (Repl. Vol. 2011) (explaining procedure for selection of health care surrogate). Other jurisdictions considering the authority of a medical power of attorney to enter an arbitration agreement on behalf of the incapacitated person for whom he/she has been appointed similarly have concluded that an agreement to arbitrate future disputes is not a medical decision within the authority granted to a medical power of attorney. *See, e.g., Lujan v. Life Care Ctrs. of America*, 222 P.3d 970 (Colo. App. 2009); *Life Care Ctrs. of America v. Smith*, 298 Ga. App. 739, 681 S.E.2d 182 (2009); *Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581 (Ky. 2012); *Dickerson v. Longoria*, 414 Md. 419, 995 A.2d 721 (2010); *Texas Cityview Care Ctr., L.P. v. Fryer*, 227 S.W.3d 345 (Tex. Ct. App. 2007). *See also Blankfield v. Richmond Health Care, Inc.*, 902 So. 2d 296 (Fla. Dist. Ct. App. 2005) (concluding health care proxy did not have authority to bind incapacitated person to arbitration agreement). *But see, e.g., Barron v. Evangelical Lutheran Good Samaritan Soc'y*, 150 N.M. 669, 265 P.3d 720 (2011) (determining that medical power of attorney has authority to bind incapacitated person to arbitration provision); *Owens v. National Health Corp.*, 263 S.W.3d 876 (Tenn. 2007) (same).

Nevertheless, we render no ruling as to whether Ms. Belcher, in her *subsequent* role as Ms. Wyatt's power of attorney, would have had the authority to bind her to the subject Arbitration Agreement because Ms. Belcher was not appointed as her mother's power of attorney until nearly three months *after* Ms. Wyatt's nursing home admission and the completion of the attendant paperwork. It is the authority that Ms. Belcher possessed at the time the Arbitration Agreement was signed on September 10, 2009, and not the authority with which she was imbued some three months later, that is determinative of her authority to bind Ms. Wyatt to the Arbitration Agreement. *See* Syl. pt. 3, *Dan Ryan Builders, Inc. v. Nelson*, ___ W. Va. ___, ___ S.E.2d ___ (No. 12-0592 Nov. 15, 2012). Insofar as the *only* authority that Ms. Belcher had to act on her mother's behalf on September 10, 2009, was her status as Ms. Wyatt's health care surrogate, the decisions she could make for her mother were limited to those concerning Ms. Wyatt's medical condition and corresponding health care.

17

care surrogate permitted her to make only health care decisions, was not a "competent part[y]" to the Agreement because she did not have the authority to sign this document on Ms. Wyatt's behalf. *See* Syl. pt. 3, in part, *Dan Ryan Builders*, ___ W. Va. ___, ___ S.E.2d ___. Therefore, the circuit court correctly refused to compel arbitration based upon Ms. Belcher's lack of authority to bind Ms. Wyatt to the Arbitration Agreement. Accordingly, we find that McDowell Nursing is not entitled to relief in prohibition because the circuit court did not err in rendering its rulings. *See* Syl. pt. 4, in part, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12.[10]

---

[10]We additionally conclude that McDowell Nursing's alternate theories for prohibitory relief also lack merit. First, we reject McDowell Nursing's argument that Ms. Belcher had the authority to bind Ms. Wyatt to the Arbitration Agreement as her apparent or ostensible agent.

> "Where a person deals with an agent, it is his duty to ascertain the extent of the agency. He deals with him at his own risk. The law presumes him to know the extent of the agent's power; and, if the agent exceeds his authority, the contract will not bind the principal[.]" Pt. 1[, in part], syllabus, *Rosendorf v. Poling*, 48 W. Va. 621, 37 S.E. 555 [(1900)].

Syl. pt. 2, in part, *John W. Lohr Funeral Home, Inc. v. Hess & Eisenhardt Co.*, 152 W. Va. 723, 166 S.E.2d 141 (1969). Moreover, "[i]n seeking to show apparent agency, a person also must evidence that he or she believed that the alleged agent was acting on the authority of another and this belief was *reasonable* under the circumstances." *All Med, LLC v. Randolph Eng'g Co., Inc.*, 228 W. Va. 634, 641, 723 S.E.2d 864, 871 (2012) (per curiam) (emphasis added). *See also* Syl. pt. 7, *Burless v. West Virginia Univ. Hosps., Inc.*, 215 W. Va. 765, 601 S.E.2d 85 (2004) ("For a hospital to be held liable for a physician's negligence under an apparent agency theory, a plaintiff must establish that: (1) the hospital either committed an act that would cause a *reasonable* person to believe that the physician in question was an agent of the hospital, or, by failing to take an action, created a circumstance that would allow

(continued...)

18

a *reasonable* person to hold such a belief, and (2) the plaintiff relied on the apparent agency relationship." (emphasis added)).

In dealing with Ms. Belcher as a purported agent of Ms. Wyatt, then, McDowell Nursing was charged with determining the scope of Ms. Belcher's authority to act on Ms. Wyatt's behalf, Syl. pt. 2, in part, *John W. Lohr Funeral Home, Inc.*, 152 W. Va. 723, 166 S.E.2d 141, and with ensuring that its belief in Ms. Belcher's authority was *reasonable*, *All Med*, 228 W. Va. at 641, 723 S.E.2d at 871. Given Ms. Belcher's status as Ms. Wyatt's health care surrogate, and the numerous references set forth in the West Virginia Health Care Decisions Act and the "Checklist for Surrogate Selection" limiting her authority to health care decisions *only*, McDowell Nursing should have known that Ms. Belcher possessed authority to make health care decisions for Ms. Wyatt and nothing more. To the extent that McDowell Nursing believed that Ms. Belcher's authority extended to the making of other, non-health care decisions, its belief was not reasonable in light of the explicit limitation of Ms. Belcher's power as a health care surrogate to the making of health care decisions on Ms. Wyatt's behalf and its own concession that the subject Arbitration Agreement was not a precondition for Ms. Wyatt's receipt of services.

Next, McDowell Nursing proposes that the Arbitration Agreement should have been enforced because Ms. Wyatt ratified it by never rescinding it. This suggestion, also, is disingenuous. On the "Checklist for Surrogate Selection" form, Ms. Wyatt's physician, who completed the form, indicated that Ms. Wyatt's incapacity was of "indefinite" duration. Given this determination, it is miraculous to suppose that Ms. Wyatt suddenly could have regained her faculties within thirty days of her nursing home admission such that she then could have rescinded the Arbitration Agreement. As the circuit court observed in its order, whether Ms. Wyatt possessed sufficient capacity to appoint Ms. Belcher as her power of attorney some three months after she had been determined to be incapacitated and admitted to the nursing home was questionable. Absent a contemporaneous recognition that Ms. Wyatt's incapacity had been cured, we do not believe that McDowell Nursing's proposition that Ms. Wyatt failed to timely rescind the Arbitration Agreement is plausible.

Finally, McDowell Nursing's contention that the circuit court singled out the Arbitration Agreement for nonenforcement, while leaving intact the remainder of the other documents executed upon Ms. Wyatt's nursing home admission, is ludicrous. The instant proceeding came before the circuit court upon McDowell Nursing's "Motion to Dismiss Plaintiff's Complaint and to Compel Arbitration." As such, the circuit court was constrained

(continued...)

19

## IV.

## CONCLUSION

For the foregoing reasons, the requested writ of prohibition is hereby denied.

Writ Denied.

---

[10](...continued)
to decide only the issues that had been presented for its consideration and decision, that being the motion to dismiss and the motion to compel arbitration. The circuit court was not asked to rule on the validity or enforceability of any of the other admissions documents. Accordingly, it does not appear that the circuit court singled out the Arbitration Agreement for nonenforcement, but, rather, that the circuit court decided the precise issue it had been requested to rule upon and issued its order deciding that limited issue.