IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2023 Term

FILED

June 8, 2023

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

_____

No. 22-777
_____

STATE OF WEST VIRGINIA EX REL. WEST VIRGINIA
DIVISION OF CORRECTIONS AND REHABILITATION,
Petitioner,

v.

HONORABLE ALFRED E. FERGUSON, Judge of the
Circuit Court of Cabell County, West Virginia, and
MARY JANE McCOMAS, as Administratrix of the Estate of Deanna R. McDonald,
Respondents.

_____

Petition for a Writ of Prohibition

WRIT DENIED

_____

Submitted: May 9, 2023
Filed: June 8, 2023

Lou Ann S. Cyrus, Esq.
Kimberly M. Bandy, Esq.
Shuman McCuskey Slicer PLLC
Charleston, West Virginia
Counsel for the Petitioner

W. Jesse Forbes, Esq.
Forbes Law Offices, PLLC
Charleston, West Virginia

Michael A. Woelfel, Esq.
Woelfel & Woefel, LLP
Huntington, West Virginia

Amanda J. Davis, Esq.
L. Dante diTrapano, Esq.
D. Christopher Hedges, Esq.
Calwell Luce diTrapano PLLC
Charleston, West Virginia
Counsel for the Respondents

JUSTICE HUTCHISON delivered the Opinion of the Court.

JUSTICE ARMSTEAD dissents and reserves the right to file a dissenting opinion.

**SYLLABUS OF THE COURT**

1.      "The writ of prohibition will issue only in clear cases, where the inferior tribunal is proceeding without, or in excess of, jurisdiction." Syl., *Vineyard v. O'Brien*, 100 W. Va. 163, 130 S.E. 111 (1925).

2.      "A writ of prohibition does not lie in the absence of a clear showing that a trial court is without jurisdiction to hear and determine a proceeding, or, having such jurisdiction, has exceeded its legitimate power." Syl. Pt. 1, *Fahey v. Brennan*, 136 W. Va. 666, 68 S.E.2d 1 (1951).

3.      "In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be

satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight." Syl. Pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).

4.      "The trial court, in appraising the sufficiency of a complaint on a Rule 12(b)(6) motion, should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief." Syl. Pt. 3, *Chapman v. Kane Transfer Co.*, 160 W. Va. 530, 236 S.E.2d 207 (1977).

5.      The Medical Professional Liability Act, W. Va. Code §§ 55-7B-1 to -12, applies only when two conditions are satisfied, that is, when a plaintiff (1) sues a "health care provider" or "health care facility" for (2) "medical professional liability" as those terms are defined under the Act. These are separate and distinct conditions. If either of these two conditions is lacking, the Act does not apply.

6.      "In interpreting a statute it is the duty of the court to look to the purpose of the enactment as well as to the language employed." Syl. Pt. 2, *Metro. Life Ins. Co. v. Hill*, 115 W. Va. 515, 177 S.E. 188 (1934).

7.      "The limits of the application of a statute are generally held to be coextensive with the evil or purpose it was intended to suppress or effectuate, and neither stop short of,

nor go beyond, the purpose which the Legislature had in view." Syl. Pt. 4, *City of Charleston v. Charleston Brewing Co.*, 61 W. Va. 34, 56 S.E. 198 (1906).

8. The West Virginia Division of Corrections and Rehabilitation is not a health care provider or health care facility as those terms are defined by the Medical Professional Liability Act. W. Va. Code § 55-7B-2(f), (g).

HUTCHISON, Justice:

The Petitioner, the West Virginia Division of Corrections and Rehabilitation ("DCR"), invokes our original jurisdiction seeking a writ of prohibition that, in effect, would dismiss a wrongful death lawsuit filed against it filed by Mary Jane McComas ("Ms. McComas"), administratrix of the estate of Deanna R. McDonald ("Ms. McDonald"). After carefully reviewing the parties' briefs and oral argument and having thoroughly considered the pertinent legal authority and the appendix record, we deny the writ.

## I. Facts and Procedural Background[1]

On August 20, 2019, Ms. McComas, as adminstratrix[2] of the estate of Ms. McDonald, sued DCR. The style of the complaint (prepared by counsel) named only DCR and "John Doe [sic], unknown employees or agents of the above entity, in their individual capacities, and as employees or agents of the above entity[.]" Nevertheless, the body of the complaint alleged that "Defendant John Does are unknown employees, representatives, or agents of PrimeCare Medical of West Virginia, Inc., PSIMed, and or Defendant WVDOCR, whose actions/inactions contributed to and caused the death of Deanna R.

---

[1]Due in no small measure to the circuit court entering several contradictory orders, DCR's brief to this Court explains that "the underlying matter has been procedurally lengthy and complicated." Ms. McComas agrees, characterizing the numerous filings in this case as a "procedural nightmare[.]" We will endeavor to simplify the background of this case as much as possible.

[2]*Black's Law Dictionary* (11th ed. 2019) states that the term "administratrix," a female administrator, is archaic. *Id*. at 57. We agree that the term is outdated. Whether male or female, one who administers a deceased's estate should be termed an administrator.

1

McDonald." PrimeCare and PSIMed are medical providers contracted with by DCR to provide medical care to inmates in DCR facilities.[3]  In the three-count complaint, Ms. McComas alleged that Ms. McDonald died while she was incarcerated at Western Regional Jail ("WRJ"). The first count of the complaint was entitled "Negligence[.]" The second count of the complaint was entitled "Medical Professional Negligence[.]" The third count of the complaint was entitled "Other Causes of Action Against Doe, the State Agency and Defendant Dorsey[.]"

DCR responded by filing a motion to dismiss on two primary, albeit alternate, grounds. First, DCR invoked West Virginia Rule of Civil Procedure 12(b)(6). DCR specifically argued that Ms. McComas failed to state a claim upon which relief could be granted against DCR because all her claims sounded in medical professional negligence. DCR contended that such claims could only be asserted against a health care provider under the Medical Professional Liability Act ("MPLA") and that DCR was not a health care provider under the MPLA. Second, DCR contended that if it could be sued under the MPLA, the circuit court lacked subject matter jurisdiction[4] because Ms. McComas did not satisfy the MPLA jurisdictional prerequisites contained in West Virginia Code § 55-7B-6.

---

[3]DCR filed a third-party complaint and an amended third-party complaint against PrimeCare, but the circuit court granted PrimeCare's motion to dismiss the amended third-party complaint filed against it by DCR.

[4]West Virginia Rule of Civil Procedure 12(b)(1) authorizes dismissal of a case for lack of subject matter jurisdiction.

After an exchange of briefs in circuit court concerning the motion to dismiss, Ms. McComas filed a motion under Rule 15(a) of the West Virginia Rules of Civil Procedure seeking leave to file an amended complaint. Ultimately, the circuit court concluded that the amended complaint was the "operative pleading" in the case.

According to the amended complaint,[5] (which names only DCR and "John Doe," which it defines as DCR employees and agents),[6] Ms. McDonald was a pretrial detainee at WRJ between August 19 and 21, 2017. She was booked into WRJ at 9:35 p.m. on August 19, 2017. Upon intake into WRJ, which occurred at 1:42 a.m. on August 20, Ms. McDonald was evaluated by Shannon Estep, who Ms. McComas believes to have been

_____

[5]Because DCR's writ of prohibition is ultimately premised on the circuit court's failure to grant DCR's Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, we take the facts in the amended complaint as true and construe the amended complaint in a light most favorable to Ms. McComas. *See, e.g., John W. Lodge Distrib. Co. v. Texaco, Inc*., 161 W. Va. 603, 605, 245 S.E.2d 157, 158 (1978) ("For purposes of the motion to dismiss, the complaint is construed in the light most favorable to plaintiff, and its allegations are to be taken as true.").

[6]The amended complaint does not address PrimeCare other than to state

> PrimeCare Medical of West Virginia, Inc. is created under the laws of the State of West Virginia and provided medical services to inmates at facilities run by the West Virginia Division of Corrections and Rehabilitation (formerly West Virginia Regional Jail and Correctional Facility Authority), including the Western Regional Jail (WRJ) in Cabell County, West Virginia, when Deanna R. McDonald died.

3

a PrimeCare employee. Ms. McDonald was diagnosed as being suicidal and having fevers, vomiting, abusing opiates daily, and suffering from seizures. Ms. McDonald disclosed recent psychiatric issues and recent treatment at St. Mary's Medical Center. Ms. McDonald was given "special management" status and placed in a holding cell under full suicide watch and "detox" precautions "until cleared by a psychologist or psychiatrist." However, no follow-up care or evaluation—including psychological or psychiatric referral—was ever provided. Intake was completed at 2:07 a.m. on August 20. Unknown WRJ staff were assigned to monitor Ms. McDonald's medical status while in the holding cell, but no one performed any wellness checks on her.

Another inmate, Heather Adkins, heard Ms. McDonald making "weird bull noises" during the evening of August 20 to 21. Inmate Markayla Stowers reported to State police investigators that Ms. McDonald had aspirated during the night of August 20. Inmate Stowers also reported that no staff entered the cell to check on Ms. McDonald. Inmate Stowers reported that Ms. McDonald had been making "dog-like" noises and had laid face down "in her own vomit."

At approximately 9:50 a.m. on August 21, a correctional officer named Spaulding and LPN Kristin Turner entered Ms. McDonald's holding cell and called a "medical emergency alert" when a "vital check" was being undertaken by them. LPN Turner found that Ms. McDonald had no pulse or respiration and was cold to the touch.

4

Ms. McDonald was discovered with her face and shoulder facing downward "in a pile of suicide smocks."

The amended complaint, like the original complaint, alleges three counts. The amended complaint, unlike the original complaint, contained no count referencing medical negligence. Count I of the amended complaint asserts "[s]tate law and common law claims and causes of action[,]" including both intentional and negligent infliction of emotional distress, a claim of failure to provide adequate medical care and a claim of failure to protect Ms. McDonald from disease. Specifically, Count I of the amended complaint avers:

> During intake and subsequently, Doe defendants and the agency's representatives, employees and agents, failed to ask appropriate mental health questions, failed to appropriately score responses and answers to the questions they did ask, failed to appropriately assess Ms. McDonald's health risks, failed to take steps to prevent and treat the mental health and substance abuse withdrawal risks present, failed to review intake notes and material, and failed to assess her medical conditions including her mental health conditions. Defendants, jointly and severally, were reckless, willful, wanton and grossly negligent in failing to immediately obtain and review the prior health records of [Ms. McDonald]. This failure was a proximate cause of, and served to causally contribute to her death.
>
> . . .
>
> Upon information and belief, [DCR's] employees, agents and representatives failed to recognize the mental health and drug and alcohol abuse withdraw [sic] issues present and denied Ms. McDonald appropriate medical care proximately causing her eventual death.

5

. . .

[DCR] has a duty to provide adequate and appropriate medical care and to ensure that those persons to whom they assign this duty are appropriately providing medical care including mental health services.

Count II of the amended complaint alleges:

The actions and inactions of defendants, jointly and severally, and the agency's staff, agents and representatives in assessing and treating Deanna R. McDonald's mental and physical health along with their failure to recognize signs of an impending health crisis. [sic] Defendants are also jointly liable for incarcerating Ms. McDonald in a group housing cell as opposed to a medical unit or hospital where she could have received appropriate treatment, was negligent and caused the death of Deanna R. McDonald. [sic].

Negligence, gross negligence and reckless by the defendant agency and Doe include:

a.    Failure to follow well-established mental health treatment protocols for mental health and substance abuse disorders and withdrawal symptoms.

b.    Failure to adequately monitor Ms. McDonald during drug and alcohol detox and withdrawal.

c.    Failure to carefully and regularly conduct mental health checks on Deanna R. McDonald during her incarceration.

d.    Conducting an intake interview upon Ms. McDonald when she was intoxicated.

e.    Failing to properly assess the mental health conditions present and seek medical and hospital clearance prior to incarcerating [Ms. McDonald].

f.    Failing to obtain readily available prior health records and by failing to give appropriate scores and weight to dangers present.

6

Finally, Count III of the amended complaint asserts that "Defendants Doe acted in a deliberately indifferent manner to the physical health, safety and well-being of Ms. McDonald." Count III specifically alleges that

> Defendant Doe was acting in the scope of employment when he or she negligently trained, negligently failed to supervise, negligently retained and negligently hired defendants Doe. Plaintiff asserts a claim against the governmental entity defendant as being vicariously liable in its negligent employment of Doe. Plaintiff asserts a claim against defendant Doe and the defendant agency, arising from negligent hiring, negligent retention and negligent supervision of defendant Doe. Plaintiff asserts a scope of employment claim against the defendant agency and Doe as each is vicariously liable for the negligent acts and omissions of defendant Doe, under the doctrine of *respondent superior*. Negligence of Doe and the agency defendant violated clearly established rights of Ms. McDonald and violated clearly established law with respect to training, supervision, discipline, employment and retention of the individual defendants which was a proximate cause of Deanna R. McDonald's disease progression, illness and death.

DCR filed a motion to dismiss the amended complaint again, invoking West Virginia Rule of Civil Procedure 12(b)(6) and arguing that the amended complaint asserted claims sounding in medical professional liability under the MPLA that could not be brought against DCR since it was not a health care provider under the MPLA. Alternatively, DCR argued that if it could be sued under the MPLA then the circuit court lacked jurisdiction over the case since Ms. McComas did not comply with MPLA's statutory prefiling requisites.

The circuit court entered a summary order denying DCR's motion to dismiss the amended complaint. DCR subsequently informed the circuit court that it desired to file an original jurisdiction petition for writ of prohibition with this Court and, to that end, requested that the circuit court enter an order containing findings of fact and conclusions of law regarding its denial of the motion to dismiss. The circuit court complied and entered such an order on September 22, 2020. DCR then filed its writ of prohibition with this Court.

## II. Standards to Issue a Writ of Prohibition and Standard of Review

DCR seeks an original jurisdiction writ of prohibition from this Court. "Prohibition is an extraordinary remedy." *Central W. Va. Reg'l Airport Auth. v. Canady*, 181 W. Va. 811, 813, 384 S.E.2d 852, 854 (1989). "This Court does not grant extraordinary relief lightly." *State ex rel. AMFM, LLC v. King*, 230 W. Va. 471, 476, 740 S.E.2d 66, 71 (2013). Invocation of extraordinary remedies disrupts the natural and orderly progress of litigation. *See, e.g., McKinney v. Jarvis*, 46 M.J. 870, 873–74 (Army Ct. Crim. App. 1997) ("The issuance of such writs is generally not favored as they disrupt the orderly judicial process of trial on the merits and then appeal."). Extraordinary remedies fall outside the normal appellate process thereby consuming valuable judicial resources, slowing down the administration of justice (even when correctly entertained), and imposing potentially unnecessary costs on litigants. *Cox v. Braden*, 266 S.W.3d 792, 795 (Ky. 2008). Consistent with these observations, "[w]e have previously cautioned that writs of prohibition provide a drastic remedy[.]" *Health Mgmt., Inc. v. Lindell*, 207 W. Va. 68, 72, 528 S.E.2d 762, 766

8

(1999). As such, "[t]he extraordinary remedy of a writ of prohibition is to be used sparingly[,]" *State ex rel. Almond v. Rudolph*, 238 W. Va. 289, 294, 794 S.E.2d 10, 15 (2016), and its use "is tightly circumscribed." *Lindell*, 207 W. Va. at 72, 528 S.E.2d at 766. In short, "[p]rohibition is not favored by the courts[,]" 72A C.J.S. *Prohibition* § 4 (2015), and "should rarely be granted." *State ex rel. Surnaik Holdings of WV, LLC v. Bedell*, 247 W. Va. 41, __, 875 S.E.2d 179, 184 (2022).

"The writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power, when the inferior court has not jurisdiction of the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers." W. Va. Code § 53-1-1 (1923). The right to relief in prohibition must be clear. "The writ of prohibition will issue only in clear cases, where the inferior tribunal is proceeding without, or in excess of, jurisdiction." Syl., *Vineyard v. O'Brien*, 100 W. Va. 163, 130 S.E. 111 (1925). Conversely, "[a] writ of prohibition does not lie in the absence of a clear showing that a trial court is without jurisdiction to hear and determine a proceeding, or, having such jurisdiction, has exceeded its legitimate power." Syl. Pt. 1, *Fahey v. Brennan*, 136 W. Va. 666, 68 S.E.2d 1 (1951); *see generally State ex rel. Rose L. v. Pancake,* 209 W. Va. 188, 191, 544 S.E.2d 403, 406 (2001) (quoting *State ex rel. Allen v. Bedell,* 193 W.Va. 32, 37, 454 S.E.2d 77, 82 (1994) (Cleckley, J., concurring)) ("To justify the execution of a writ of prohibition, a petitioner 'has the burden of showing that the lower court's jurisdictional usurpation was clear and indisputable . . . ."). Consequently, "[a] party seeking a writ of prohibition carries

9

a heavy burden." *State ex rel. W. Va. Secondary Sch. Activities Comm'n v. Cuomo*, ___ W. Va. ___, ___, 880 S.E.2d 46, 52 (2022).

A party seeking a writ of prohibition must prove either that (1) the lower tribunal completely lacked personal or subject matter jurisdiction or (2) the lower tribunal exceeded its legitimate powers. In the first situation, the party must prove the lower tribunal lacked jurisdiction over the parties or the subject matter. As to the second situation, we have explained:

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. Pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).

10

DCR's request for a writ of prohibition flows from the circuit court's order denying DCR's motion to dismiss Ms. McComas's lawsuit against it under Rule 12(b)(6). This is of some moment because the law relating to Rule 12(b)(6) motions provides the procedural parameters to determine if the circuit court's order was clearly erroneous as a matter of law.

Rule 12(b)(6) authorizes a circuit court to dismiss a claim when a plaintiff has failed to state a claim upon which relief can be granted. "A motion under Rule 12(b)(6) tests the adequacy of the claims and the notice provided by the allegations in the pleading." *Mountaineer Fire & Rescue Equip., LLC v. City Nat'l Bank of W. Va.*, 244 W. Va. 508, 520, 854 S.E.2d 870, 882 (2020). "When a Rule 12(b)(6) motion is made, the pleading party has no burden of proof. Rather, the burden is upon the moving party to prove that no legally cognizable claim for relief exists." *Id*., 854 S.E.2d at 882. "For purposes of the motion to dismiss, the complaint is construed in the light most favorable to plaintiff, and its allegations are to be taken as true." *John W. Lodge Distrib. Co.*, 161 W. Va. at 605, 245 S.E.2d at 158. "The trial court, in appraising the sufficiency of a complaint on a Rule 12(b)(6) motion, should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief." Syl. Pt. 3, *Chapman v. Kane Transfer Co.*, 160 W. Va. 530, 236 S.E.2d 207 (1977). Given this background, "this Court has previously noted, motions to dismiss under Rule 12(b)(6) are 'viewed with disfavor and [should be] rarely granted.'" *Evans v.*

11

*United Bank, Inc.*, 235 W. Va. 619, 627, 775 S.E.2d 500, 508 (2015) (quoting *John W. Lodge Distributing Co., Inc.*, 161 W.Va. at 606, 245 S.E.2d at 159).

Bearing these standards in mind, we turn to the issues before the Court.

### III. Discussion

DCR's primary argument to this Court is that the allegations contained in the amended complaint fall within the MPLA's definition of "medical professional liability." DCR then argues that only a health care provider as defined by the MPLA can be sued for medical professional liability. It finally concludes, "[b]ecause the [DCR] is not a health care provider, the claims asserted in the Amended Complaint, which are based upon medical professional liability, regardless of how pled, should be dismissed against it."

Ms. McComas concurs that "claims for medical professional liability can only be asserted against health care providers." She, however, takes issue with DCR's characterization of the allegations in the amended complaint as raising medical professional liability claims. Ms. McComas argues that "the Amended Complaint contains no allegations of medical professional liability and contains no allegations of medical negligence against any healthcare professionals or facility." Ms. McComas argues that "[w]hile the [DCR] does not owe any inmate, including the Respondent's decedent Deanna McDonald, a duty of care with respect to the *provision* of health care, [DCR] *does* owe all persons housed in the facility the duty to ensure that the [sic] health care is available, and

12

that the inmate has access to it." (emphasis in original). According to Ms. McComas, "[t]hat is not providing health care, it is ensuring it." While we agree with Ms. McComas that a writ of prohibition should be denied, we deny the writ for somewhat different reasons than she advances.[7]

This prohibition case presents a question of statutory interpretation. "As with any matter involving the interpretation and application of statutes, we first must determine the Legislature's intent in promulgating the statutory law at issue." *State ex rel. Tucker Cnty. Solid Waste Auth. v. W. Va. Div. of Lab.*, 222 W. Va. 588, 595, 668 S.E.2d 217, 224 (2008). In such a circumstance, "[w]e look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't,* 195 W. Va. 573, 587, 466 S.E.2d 424, 438 (1995). Since "[t]he MPLA is a definition-based statute" and "[i]ts applicability is set forth in a series of definitions[,]" Thomas J. Hurney, Jr. & Jennifer M. Mankins, *Medical Professional Liability Litigation in West Virginia: Part II*, 114 W. Va. L. Rev. 573, 576 (2012), we begin our analysis with the MPLA's definitions section.

_____

[7]"When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *State v. Blake*, 197 W. Va. 700, 706, n.10, 478 S.E.2d 550, 556 n.10 (1996) (citations omitted); *cf. State v. Omechinski*, 196 W. Va. 41, 44, 468 S.E.2d 173, 176 (1996) ("For different reasons, we agree with the State and find no reversible error in this case.").

The 2017 version[8] of the MPLA defined "Medical professional liability" as

> any liability for damages resulting from the death or injury of a person for any tort or breach of contract based on health care services rendered, or which should have been rendered, by a health care provider or health care facility to a patient. It also means other claims that may be contemporaneous to or related to the alleged tort or breach of contract or otherwise provided, all in the context of rendering health care services.

W. Va. Code § 55-7B-2(i). "Health care" is defined under the MPLA as

> (1) Any act, service, or treatment provided under, pursuant to, or in the furtherance of a physician's plan of care, a health care facility's plan of care, medical diagnosis, or treatment;
>
> (2) Any act, service, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider or person supervised by or acting under the direction of a health care provider or licensed professional for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement, including, but not limited to, staffing, medical transport, custodial care, or basic care, infection control, positioning, hydration, nutrition, and similar patient services; and
>
> (3) The process employed by health care providers and health care facilities for the appointment, employment, contracting, credentialing, privileging, and supervision of health care providers.

*Id.* § 55-7B-2(e). In turn a "Health care facility" is

---

[8]The 2017 version of the MPLA's definition section was in effect both when Ms. McDonald passed away and when Ms. McComas filed her original complaint. The 2017 definitions are identical to those contained in the most recent version of the MPLA.

14

any clinic, hospital, pharmacy, nursing home, assisted living facility, residential care community, end-stage renal disease facility, home health agency, child welfare agency, group residential facility, behavioral health care facility or comprehensive community mental health center, intellectual/developmental disability center or program, or other ambulatory health care facility, in and licensed, regulated, or certified by the State of West Virginia under state or federal law and any state-operated institution or clinic providing health care and any related entity to the health care facility[,]

*id*. § 55-7B-2(f), while a "Health care provider" is

a person, partnership, corporation, professional limited liability company, health care facility, entity, or institution licensed by, or certified in, this state or another state, to provide health care or professional health care services, including, but not limited to, a physician, osteopathic physician, physician assistant, advanced practice registered nurse, hospital, health care facility, dentist, registered or licensed practical nurse, optometrist, podiatrist, chiropractor, physical therapist, speech-language pathologist, audiologist, occupational therapist, psychologist, pharmacist, technician, certified nursing assistant, emergency medical service personnel, emergency medical services authority or agency, any person supervised by or acting under the direction of a licensed professional, any person taking actions or providing service or treatment pursuant to or in furtherance of a physician's plan of care, a health care facility's plan of care, medical diagnosis or treatment; or an officer, employee, or agent of a health care provider acting in the course and scope of the officer's, employee's or agent's employment.

*Id*. § 55-7B-2(g). Finally, the MPLA defines a "Patient" as "a natural person who receives or should have received health care from a licensed health care provider under a contract, expressed or implied." *Id*. § 55-7B-2(*l*).

Running throughout the definition section of the MPLA is the Legislature's concern for *professional* health care providers or health care facilities being sued for medical *professional* negligence in providing medical or health care. *See, e.g.*, W. Va. Code § 55-7B-2(i) (emphasis added) (defining "medical *professional* liability" as "any liability for damages resulting from the death or injury of a person for any tort or breach of contract based on health care services rendered, or which should have been rendered, by *a health care provider or health care facility* to a patient."); *id*. § 55-7B-2(m) (emphasis added) (defining "patient" as "a natural person who receives or should have received health care from a *licensed health care provider* under a contract, expressed or implied."). Thus, our review establishes (and we so hold) that the Medical Professional Liability Act, W. Va. Code §§ 55-7B-1 to -12, applies only when two conditions are satisfied, that is, when a plaintiff (1) sues a "health care provider" or "health care facility" for (2) "medical professional liability" as those terms are defined under the Act. These are separate and distinct conditions. If either of these two conditions is lacking, the Act does not apply. We now examine whether DCR is a "health care provider" or "health care facility" under the MPLA. We conclude that it is not.

DCR acknowledges in its *Petition for Writ of Prohibition* that it "is not a health care provider as defined by W. Va. Code § 55-7B-2(g)[.]" After independently reviewing the MPLA, we agree. DCR is not listed as a health care provider or health care facility under the MPLA nor does it fall within the ambit of any of the individuals or groups identified in the MPLA as health care providers or health care facilities. *See* W. Va. Code

16

§ 55-7-2(f), (g). These omissions of DCR from the MPLA's definitions section establish that the Legislature did not mean to include DCR as a health care provider or health care facility. *See Phillips v. Larry's Drive-In Pharmacy, Inc.*, 220 W. Va. 484, 493, 647 S.E.2d 920, 929 (2007) ("We believe that there is no better definition of what constitutes the medical care community, and therefore what groups and individuals are included as 'health care provider[s]' under the MPLA, than the unambiguous and exclusive list of defined providers in W. Va. Code, 55–7B–2(c) [now (g)].").

Furthermore, "[i]t is a cardinal rule governing the interpretation of statutes that the purpose for which a statute has been enacted may be resorted to by the courts in ascertaining the legislative intent." *State ex rel. Bibb v. Chambers*, 138 W. Va. 701, 717, 77 S.E.2d 297, 306 (1953). Indeed, "in interpreting a statute it is the duty of the court to look to the purpose of the enactment as well as to the language employed." Syl. Pt. 2, *Metro. Life Ins. Co. v. Hill*, 115 W. Va. 515, 177 S.E. 188 (1934). As we have explained, "[t]he limits of the application of a statute are generally held to be coextensive with the evil or purpose it was intended to suppress or effectuate, and neither stop short of, nor go beyond, the purpose which the Legislature had in view." Syl. Pt. 4, *City of Charleston v. Charleston Brewing Co.*, 61 W. Va. 34, 56 S.E. 198 (1906). The Legislature included a legislative findings and declaration of purpose section in the MPLA. W. Va. Code § 55-7B-1. A review of this section also leads us to conclude that the Legislature did not intend the MPLA to apply to DCR.

17

The Legislature passed the MPLA in an effort to remedy what it perceived as a crisis in mounting lawsuits against professional health care providers and health care facilities that led to difficulty in procuring reasonable liability insurance for the medical community. *See* W. Va. Code § 55-7-1 ("It is the duty and responsibility of the Legislature to balance the rights of our individual citizens to adequate and reasonable compensation with the broad public interest in the provision of services by qualified health care providers and health care facilities who can themselves obtain the protection of reasonably priced and extensive liability coverage[.]"); *see also Mathis v. Ziegler*, No. CV 5:18-01111, 2019 WL 7875166, at *5 (S.D.W. Va. Nov. 13, 2019) (footnote omitted), *report and recommendation adopted*, No. 5:18-CV-01111, 2020 WL 598398 (S.D.W. Va. Feb. 6, 2020) ("The Legislature enacted the MPLA in response to a perceived crisis in the availability and affordability of liability insurance for health care providers and the availability of quality health care for patients. W. Va. Code §§ 55-7B-1."); Thomas J. Hurney, Jr. & Rob J. Aliff, *Medical Professional Liability in West Virginia*, 105 W. Va. L. Rev. 369, 371 (2003) ("The MPLA was passed in the face of an insurance crisis in West Virginia which materially limited the ability of hospitals and physicians to obtain coverage."). In passing the MPLA the Legislature sought "to find a balance between the rights of injured persons and the desire to maintain a stable health care system in our State." *Louk v. Cormier*, 218 W. Va. 81, 92, 622 S.E.2d 788, 799 (2005). Thus, the MPLA is concerned with those who provide health care. It is important to recognize that DCR does not provide health care itself, but only provides access to health care through its contract with PrimeCare. "[P]roviding 'access' to health care is considerably different from actually

18

providing such care." *Est. of Harper ex rel. Al-Hamim v. Denver Health & Hosp. Auth.*, 140 P.3d 273, 277 (Colo. Ct. App. 2006). Extending the MPLA to encompass DCR would do nothing to advance the purpose of the MPLA as set forth in the Act's legislative findings and declaration of purpose.

Neither the MPLA's plain language nor its legislatively avowed purpose support the conclusion that DCR is a health care provider or health care facility under the Act. We therefore hold that the West Virginia Division of Corrections and Rehabilitation is not a health care provider or health care facility as those terms are defined by the Medical Professional Liability Act. W. Va. Code § 55-7B-2(f), (g).[9]

As to whether the amended complaint alleges medical professional negligence, the claims asserted against DCR sound not in medical professional negligence but in ordinary negligence in failing to reasonably oversee inmates and to provide them access to medical care. In other words, the duty the amended complaint claims that DCR owed to Ms. McDonald was not that of health care provider to patient, but of custodian to inmate to provide reasonable care and protection from reasonably foreseeable harm. *See generally* 60 Am. Jur. 2d *Penal and Correctional Institutions* § 158 (2014) (footnotes

---

[9]It is for this reason that we do not find that *State ex rel. PrimeCare Med. of W. Va, Inc. v. Faircloth*, 242 W. Va. 335, 835 S.E.2d 579 (2019) helps DCR. In that case, there was no dispute that the only petitioner, PrimeCare, was a "health care provider." *Id*. at 342 n.16, 835 S.E.2d at 586 n.16.

omitted) ("A jailer owes a duty to prisoners to keep them safe, protect them from unnecessary harm, and exercise reasonable and ordinary care for their life and health. Custodians may have particular duties, depending on their knowledge of risks to inmates; thus, if an inmate's suicidal tendencies are known, the custodian's duty is elevated."). To the extent that the amended complaint's allegations may sound in medical professional negligence based on any provider to patient relationship between Ms. McDonald and PrimeCare, Ms. McComas properly observes that a plaintiff is not required to sue all tortfeasors and the decision to sue all or only some of them is up to the plaintiff alone. *See, e.g., Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit."); *Robbins Music Corp. v. Alamo Music, Inc.*, 119 F. Supp. 29, 31 (S.D.N.Y.1954) ("It is hornbook law that an aggrieved party is not compelled to sue all tort-feasors. He may sue one or more or all of them, at his discretion."). Whether that choice turns out to be wise or unwise, it is a choice with which Ms. McComas must ultimately live.[10]

---

[10]For example, we cannot discern what impact, if any, West Virginia's non-party fault statute, W. Va. Code § 55-7-13d (2016), would have on this case. That is a matter that must be determined in the first instance in the circuit court.

Because the MPLA does not apply to DCR, the circuit court did not commit clear error as a matter of law in declining to dismiss the amended complaint. Accordingly, there is no basis to issue a writ of prohibition.[11]

## IV. Conclusion

For the foregoing reasons, the writ of prohibition is denied.

Writ denied.

---

[11]The amended complaint raises a Fourteenth Amendment constitutional deliberate indifference claim. DCR correctly notes that such a claim can only be brought against a "person" under 42 U.S.C. § 1983 and that, as a state agency, it is not a "person" subject to a suit for damages under that section. *See, e.g., Strickler v. Waters,* 989 F.2d 1375, 1388 (4th Cir. 1993) ("[N]either the Commonwealth of Virginia nor its Department of Corrections is a proper party to a section 1983 suit[.]"); *Green v. Rubenstein*, 644 F. Supp.2d 723, 738 (S.D.W. Va. 2009) ("The State and its agencies such as the Division of Corrections are not 'persons' amenable to suit under Section 1983 for damages."). Ms. McComas agrees and in her prohibition response states that she is only suing the "John Doe" individual defendants, and not DCR, for deliberate indifference.

21